UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JASON SMITH**,                                        Case No. 5:11 CV 2104

             Plaintiff,                         Magistrate Judge James R. Knepp II

   v.                                              MEMORANDUM  OPINION  AND
                                                   ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

             Defendant.

### INTRODUCTION

Plaintiff Jason Smith seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

On February 23, 2010, Plaintiff filed applications for DIB and SSI claiming he was disabled due to seizure disorder, asthma, attention deficit hyperactivity disorder (ADHD), psychotic disorder, disc herniation, left foot drop, club foot, hypertension, obesity, and tenosynovitis at the left ankle. (Tr. 13, 135, 138). He  alleged a disability onset date of May 17, 2008. (Tr. 13). His claims were denied initially (Tr. 83, 87) and on reconsideration (Tr. 92, 99). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 106). Plaintiff (represented by counsel), his girlfriend Tara Hill, and a vocational expert (VE) testified at the hearing, after which the ALJ found

Plaintiff not disabled. (Tr. 7, 30). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On October 5, 2011, Plaintiff filed the instant case. (Doc. 1).

Plaintiff challenges only the ALJ's conclusions regarding his mental impairments (*see* Doc. 14), and therefore waives any claims about the determinations of his physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Accordingly, the undersigned addresses only the record evidence pertaining to Plaintiff's mental health. Further, Plaintiff addresses medical records which pre-date his alleged onset date. While medical evidence predating Plaintiff's onset date is not irrelevant, the Court may only consider evidence from those records in combination with evidence after the onset date to determine disability. *De Board v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006).

### FACTUAL BACKGROUND

Born March 18, 1984, Plaintiff was 27 years old when the ALJ hearing was held on August 4, 2011. (Tr. 33, 135). Plaintiff has a high school education and past relevant work as a kitchen helper, fast-food worker, and cleaner. (Tr. 55, 156).

### *Medical Evidence*

Treatment Records

In June 2003, Plaintiff was seen at Viola Startzman Free Clinic (Startzman) for a neurological exam as a result of a seizure. (Tr. 253). It was noted "[h]e had no prior history for epilepsy and the event was a surprise to him and his family." (Tr. 253). The seizure was prompted by an asthma attack. (Tr. 253). A CT scan of the brain was abnormal, revealing possible "agenesis

2

of the corpus callosum" and the doctor ordered further testing. (Tr. 253-55). On November 22, 2004, Dr. Michael Leslie evaluated Plaintiff and diagnosed epileptic seizure disorder. (Tr. 256-57). Dr. Leslie noted Plaintiff was a poor historian regarding his "[e]pilepsy history." (Tr. 256).

On May 16, 2008, Plaintiff was transported to Wooster Community Hospital (WCH) emergency room because he had a seizure. (Tr. 335). His girlfriend's grandfather died while they were visiting him at hospice and "[a]fterwards [Plaintiff] had a seizure." (Tr. 335). Plaintiff reported he had not been taking his seizure medication, Depakote, for the last month. (Tr. 335). Plaintiff was assessed as stable and discharged.  (Tr. 335). The next day, Plaintiff experienced another seizure and was transported to WCH. (Tr. 352). Upon arrival, Plaintiff was able to answer questions but was postical. (Tr. 352). He was discharged and agreed to follow-up and continue to take his Depakote. (Tr. 352).

On May 28, 2008, Plaintiff's mother and girlfriend took Plaintiff to WCH for a possible seizure. Upon arrival, Plaintiff became violent with hospital staff and had to be restrained. (Tr. 370). Plaintiff was diagnosed with an acute seizure with a postical state and violent behavior. (Tr. 370). He was discharged and instructed to follow-up with Startzman Clinic. (Tr. 370).

On May 30, 2008, Nurse Tickton from the Startzman Clinic phoned Plaintiff after reading his May 28, 2008 WCH emergency report. (Tr. 434). She verbally warned Plaintiff if he remained noncompliant with Depakote and failed to follow-up with a neurologist the clinic would dismiss him. (Tr. 434).

On July 21, 2008, Plaintiff was ordered to WCH emergency by the Crisis Center because he threatened to harm himself. (Tr. 386). Hospital notes indicated Plaintiff had a "history of anger issues, possible personality disorder, seizures, asthma, and back problems." (Tr. 386). Plaintiff had

no specific plan to commit suicide but he did "have futuristic and realistic future thoughts" of harming himself. (Tr. 386). WCH determined Plaintiff was not in an emergent state and instructed him to follow up with a crisis worker. (Tr. 386).

On October 22, 2008, Plaintiff was taken to WCH emergency for a seizure. (Tr. 395). Upon arrival, Plaintiff was postical and not able to answer questions. (Tr. 395). His girlfriend stated he had a seizure which caused his left hand and right leg to shake. (Tr. 395). She said he had been taking his medication but testing revealed his Depakote levels were subtherapeutic. (Tr. 395, 397, 726).

Plaintiff returned to WCH emergency when he experienced a generalized tonic-clonic seizure during a counseling session. (Tr. 720). His seizure medication level was low and he was given Dilantin after arrival. (Tr. 720). He was discharged with instructions to follow-up with Dr. Zewail. (Tr. 720).

Plaintiff established care for epilepsy with Dr. Gwendolyn Lynch at Cleveland Clinic of Wooster Neurology Department on March 4, 2009. (Tr. 566). Plaintiff said his seizures began when he was an infant, occurred two to three times per month, and were mainly preceded by asthma attacks. (Tr. 566). Plaintiff reported seeing neurologists in the distant past but said his epilepsy was currently managed by the hospital and free clinics. (Tr. 566). Dr. Lynch found Plaintiff's epilepsy was dependant on his asthma, explaining if his asthma was controlled, he would not likely experience a seizure. (Tr. 566). She instructed Plaintiff to see a pulmonary specialist, maintain his current level of Depakote, and follow-up in three months. (Tr. 567). At Plaintiff's follow-up on June 12, 2009, Dr. Lynch noted he had not seen the pulmonary specialist and he reported "'mini seizures' that no one else [wa]s able to recognize." (Tr. 564).

Plaintiff was taken to WCH by ambulance for an asthma attack combined with a seizure on

April 20, 2009. (Tr. 690). His father reported Plaintiff missed a dose of his medication and he had been assaulted earlier that day, "where he got pushed and kicked in[] his head, chest, and legs." (Tr. 690). On examination, Plaintiff's vital signs were stable, he was alert, and was in no obvious distress. (Tr. 690). Plaintiff was given seizure medication and discharged. (Tr. 690).

On July 9, 2009, Dr. Zewail noted Plaintiff's seizures and asthma were controlled. (Tr. 577). Plaintiff followed up with Dr. Zewail on August 12, 2009 and reported having auditory and visual hallucinations. (Tr. 576). On examination, Plaintiff had no acute neurological symptoms and no suicidal ideations. (Tr. 576). She prescribed Seroquel for hallucinations. (Tr. 576).  On September 9, 2009, she diagnosed Plaintiff with schizophrenia, controlled on Seroquel. (Tr. 575).

On January 11, 2010, Plaintiff went to WCH for an asthma attack. (Tr. 625). He reported feeling like he was going to have a seizure, "but [he] never actually seized." (Tr. 625). Plaintiff had not been taking his asthma or seizure medication and he was discharged with re-fills and prescriptions for both. (Tr. 625).

Plaintiff returned to Dr. Lynch on July 21, 2010. (Tr. 900).  Plaintiff requested clearance to get his driver's license so he could return to work. (Tr. 900). Dr. Lynch noted Plaintiff's last seizure had been in June 2009 and Depakote was controlling his seizures. (Tr. 900). On February 16, 2011, Plaintiff had a six-month follow-up appointment with Dr. Lynch. (Tr. 893). She noted he had not been seizing and his Depakote levels were therapeutic, and she cleared him to drive. (Tr. 893). Throughout treatment with Dr. Lynch, Plaintiff never mentioned hallucinations or delusions.

Vocational Rehabilitation

Beginning in February 2008 through November 2008, Plaintiff received employment assistance through the Bureau of Vocational Rehabilitation (BVR). (Tr. 161, 270-310, 493-501).

With the help of BVR, Plaintiff filled out employment applications, followed up with prospective employers, and attended job fairs and work assessments at employment locations. (Tr. 271-72). Plaintiff claimed he could not procure employment because he was "struggling with being able to focus on [] job activities due to relationship and family issues" and said a lack of transportation kept him from following up with prospective employers. (Tr. 276, 281). BVR provided Plaintiff with taxi money to aid him in finding work beyond walking distance and picked him up for meetings. (Tr. 281, 283). Even so, Plaintiff often skipped or missed appointments with his counselors, even when they showed up at his home to pick him up for appointments or job fairs. (Tr. 272-75, 283-85, 296, 302, 308).

BVR documented each visit with Plaintiff in the form of "Billable Service Progress Notes". (Tr. 270-77) On occasion, the notes included a "Level of Functioning and Participation Checklist." (*See* Tr. 276). Plaintiff was generally described as cooperative and able to follow instructions. (Tr. 279, 292, 294, 304). Mainly, caseworkers marked "not applicable" when asked about Plaintiff's anxiety, agitation, depression, judgment, hallucinations, delusions, and orientation. (*See* Tr. 280, 282, 285, 286, 295, 297, 303, 308). Occasionally, BVR case workers noted Plaintiff's participation, appearance and hygiene were good, further noting he had no problems with hallucinations, delusions, anxiety, or agitation, but mild or moderate depression and judgment. (Tr. 276, 306, 307). Throughout this time period, Plaintiff worked efficiently in a group setting and independently and was generally described as having a positive mood. (*See* Tr. 279).

Counseling Center

Plaintiff also received counseling and employment assistance through the Counseling Center of Wayne and Holmes Counties (Counseling Center) between April 2008 and March 2011. He was

6

mainly treated by therapist Christine Cunningham and licensed social workers Jean Brugger and Katherine Bennett. (Tr. 445-462, 582-97, 765-795, 795-827). Generally, Plaintiff's main stressors were ongoing issues with his girlfriend and living situation, and treatment goals aimed to decrease his depression and anger. (Tr. 445-462, 585-97, 765-95, 795-827).  In the beginning, Plaintiff did not report hallucinations or delusions and his visits generally involved discussions on how to eliminate life stressors and depression. (*See* Tr. 445-462, 795-827). In fact, Plaintiff never mentioned or reported hallucinations or delusions in 2008 or the beginning of 2009. (Tr. 445-462, 795-827).

On April 17, 2009, Plaintiff expressed frustration about being denied social security disability. (Tr. 822). He was "frustrated that a neighbor was recently awarded disability due to being a recovering alcoholic and in [Plaintiff's] eyes ha[d] wasted all of the money." (Tr. 822). Plaintiff felt "like social security [was] not recognizing the degree of impairment he deal[t] with on a daily basis." (Tr. 822). On June 19, 2009, Plaintiff discussed his social security disability appeal and his frustration with his living situation. (Tr. 813).

Beginning in August 2009, Plaintiff began reporting hallucinations and hearing "command voices" (Tr. 585-97, 765-95). For example, both Ms. Cunningham and Ms. Brugger checked a box indicating Plaintiff's hallucinations were either mild, moderate, or severe at Plaintiff's visits even if hallucinations were not discussed in the treatment notes.  (Tr. 585-97, 765-95, 795-827). On one occasion, Ms. Brugger reported Plaintiff was "visibly talking to his 'voices' at times during the session." (Tr. 594).

On August 20, 2009, Plaintiff saw Andrew Santora, Ed.D., CNS, APN at the Counseling Center at Ms. Cunningham's  request. (Tr. 571-72). Plaintiff reported hearing voices, "noting [] these have been predominant for the past month but [] they have been intermittent since the age of

13." (Tr. 571). He said he "hear[d] a demonic voice, [and] a devil servant who want[ed] him to cause destruction and [] play chicken (on his bicycle) [with] an 18 wheeler." (Tr. 571). "He also hear[d] voices of 'good souls.'" (Tr. 571). While he did not have suicidal ideations at the time, he reported three suicide attempts: the first at age eighteen by cutting; the second at age twenty "playing chicken" and attempting to crash into another car; and the last in 2006 or 2007 where he jumped off a bridge. (Tr. 571). Dr. Santora noted Plaintiff was slightly unkempt with a slightly dull affect, but his thought process was logical and his demeanor cooperative. (Tr. 571). He noted Plaintiff experienced anger outbursts, mood swings, aggressive behavior, and auditory, visual, olfactory, and gustatory hallucinations. (Tr. 571). Dr. Santora diagnosed Plaintiff with psychotic and depressive disorder and assigned a Global Assessment Functioning (GAF) score of 35[1]. (Tr. 572). No treatment plan was offered because Plaintiff claimed Dr. Zewail was treating him for his condition. (Tr. 572).

On September 28, 2009, Ms. Brugger marked that Plaintiff had mild anxiety and depression and moderate judgment, with hallucinations. (Tr. 586). The same day, Plaintiff told Ms. Cunningham he was stressed because of issues with his girlfriend but was talking with his family about opening a business. (Tr. 587). The next day, Ms. Brugger marked that Plaintiff had no anxiety or agitation, but mild hallucinations and moderate depression and judgment. (Tr. 585).

In a summary report dated October 23, 2009, Ms. Cunningham noted Plaintiff's increased symptoms including hallucinations with a focus on spiritual warfare. (Tr. 582).

On November 24, 2009, Plaintiff reported financial struggles were triggering stress –

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood". *Id.* at 34.

specifically "he, his [girlfriend], and her mother ha[d]to manage to meet basic needs with only one [social security disability] income and three people's worth of food stamps." (Tr. 789). At this session, "[Plaintiff] did not appear to be distracted by voices and held good focus and concentration" other than occasional texting during the meeting. (Tr. 789).

At a meeting on December 1, 2009, Plaintiff "was verbally able to detail situations where he was able to evict people who [had been living with him] but could not pay their way [living] in his ap[artment]." (Tr. 788). He voiced a desire to buy a house and become a landlord. (Tr. 788). On December 9, 2009, Ms. Brugger noted that "[Plaintiff] appears very focused on getting his disability and at times appears to emphasize the drama of his symptoms more than being distressed over them." (Tr. 786).

On June 4, 2010, Plaintiff showed up with a two-year old child who was disruptive, and Ms. Bennett noted not much could be accomplished during the meeting. (Tr. 765). Plaintiff had no complaints of hallucinations at that time. (Tr. 765).

Between June 16, 2010 and November 5, 2010 Plaintiff mainly reported stress due to issues with his girlfriend and his living situation. (Tr. 925-965). Notably, Plaintiff's reports of hallucinations stopped as abruptly as they started. (Tr. 925-65). In fact, by June 2010, each caseworker began marking that Plaintiff had "no problem" with hallucinations or delusions at each visit. (Tr. 925-65).

Around July 23, 2010, Plaintiff was arrested for "an incident at his home", where he fought with police and was tasered three times. (Tr. 962). After his arrest, Plaintiff generally discussed being nervous about his court dates and whether or not he wanted to break up with his girlfriend. (Tr. *See* Tr. 954). Again, he reported no hallucinations or delusions.

9

By March 11, 2011, Plaintiff was attending group therapy and participated well within the group. (Tr. 911). The caseworker noted Plaintiff still had no problems with hallucinations, delusions, depression, anxiety, or judgment. (Tr. 911).

Opinion Evidence

Dr. James Sunbury, an independent psychological examiner, evaluated Plaintiff on April 8, 2009. (Tr. 529-32). On examination, Plaintiff was able to concentrate on questions, made fair eye contact, and maintained his train of thought. (Tr. 531). Plaintiff reported being depressed and recalled a suicide attempt in 2002 where he jumped off a bridge and hurt his leg. (Tr. 531). Plaintiff also reported having panic attacks twice a week. (Tr. 531). Dr. Sunbury found Plaintiff's insight and judgement fair and assigned him a GAF score of 60[2]. (Tr. 531-32). Plaintiff showed no sign of thought disorder, he did not describe intrusive thoughts, and he revealed no delusional or paranoid ideation. (Tr. 531). Dr. Sunbury opined Plaintiff was no more than mildly impaired in his functional and psychological ability to work and diagnosed him with depressive disorder, not otherwise specified. (Tr. 532).

On April 19, 2009, non-examining state consultant Dr. Caroline Lewin found Plaintiff's impairments did not meet or equal a listed impairment. (Tr. 533-47). Generally, she found Plaintiff was moderately limited in understanding, memory, sustained concentration, and persistence, but markedly limited in his ability to understand, remember, and carry out detailed instructions. (Tr. 548). Dr. Lewin noted Plaintiff had "a long history of problems with anger management." (Tr. 550). She discussed Plaintiff's seizure history, cognitive difficulties, and reporting discrepancies about

---

2. A higher number represents a higher level of functioning. *DSM-IV-TR,* 32-33. A GAF score between 51 and 60 indicates "moderate symptoms (e.g., flat affect or circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

10

his  mental history during consultive examinations. (Tr. 550). For example, Plaintiff denied receiving vocational assistance even though notes indicated satisfactory reports and work assessments from BVR and the Counseling Center. (Tr. 550). Dr. Lewin rejected Dr. Sunbury's assessment that Plaintiff was only mildly impaired in his ability to work and afforded his opinion no weight. (Tr. 550). Instead, she opined Plaintiff's long history of fighting would moderately restrict relating, his suicide attempts suggested moderate stress intolerance, and he was moderately limited in his ability to concentrate and recall. (Tr. 550). Regarding Plaintiff's mental residual functional capacity (RFC), she found:

> The claimant remains able to handle most simple instructions in a low stress work setting where concentration needed is short term and relating to others is kept superficial. He has problems with fighting and complying with medical supervision and directives. However he was cooperative at the [consultive examination]. He may show some dependency on others at times and his tendency to avoid job searches due to being "too busy at home" suggests that attendance and a normal work week may sometimes be impacted.

(Tr. 550).

On September 16, 2009, state agency consultant Dr. Steven Meyer affirmed Dr. Lewin's assessment. (Tr. 581). He noted a summary report indicating returned hallucinations in the preceding months, but also noted office visit notes were not consistent with the summary report. (Tr. 581). He noted Plaintiff's statement regarding memory loss was partially credible but the evidence did not support new and material changes to Dr. Lewin's initial decision. (Tr. 581).

On January 7, 2010, John Comley, Psy. D., evaluated Plaintiff and prepared a mental functional capacity assessment at the request of the state disability office. (Tr. 608-13). Although nothing in the record supported it, Plaintiff told Dr. Comley he was diagnosed with bipolar disorder and schizophrenia at the Counseling Center ten years prior. (Tr. 609). During the exam, Dr. Comley

11

noted Plaintiff was alert, but was defensive and guarded at some times and polite and open at other times. (Tr. 609). Again, though the record did not support it, Plaintiff claimed he graduated from South University, an online college. (Tr. 609). Contrary to his testimony that he could no longer work because of seizures, Plaintiff insisted his last job was with Family Life Center, there was misunderstanding, and he "called it quits." (Tr. 609). Plaintiff reported hearing voices and having hallucinations. (Tr. 609). Dr. Comley estimated Plaintiff's basic intellectual abilities were average but within the low average range for intellectual functioning.  (Tr. 610-11). He saw Plaintiff's condition "basically as the combination of a mood disorder and a borderline psychotic condition, with a depressed mood, a number of schizoid qualities, and low ego strength." (Tr. 610).

With regard to his work situation, Dr. Comley concluded Plaintiff should be considered "psychologically disabled." (Tr. 612). Despite that conclusion, Dr. Comely found Plaintiff was not significantly limited in his ability to understand, remember, and carry out detailed instructions and he was not limited in his abilities to remember locations and work-like procedures and understand and remember very short and simple instructions. (Tr. 613). Plaintiff was not limited in his abilities to ask simple questions or request assistance, respond appropriately to changes in a work setting, be aware of hazards and take precautions, travel to unfamiliar places, or use public transportation. (Tr. 613). Plaintiff was also not significantly limited in his ability to sustain an ordinary routine without special supervision. (Tr. 613).  However, Plaintiff was moderately limited in his abilities to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and act appropriately with the public. (Tr. 613). Dr. Comley found Plaintiff was markedly limited in his abilities to work in coordination with or proximity to others without being distracted, complete a normal workday and

12

workweek without interruptions from psychologically based symptoms, accept instruction and respond to criticism appropriately, get along with co-workers, and maintain socially appropriate behavior. (Tr. 613).

### ALJ Hearing

Plaintiff, his attorney, and his girlfriend Tara Hill, appeared and testified before the ALJ on April 19, 2011. (Tr. 30). Plaintiff's attorney asserted Plaintiff was physically capable but not mentally capable of performing sedentary work. (Tr. 36). He based this premise on Dr. Comley's assessment coupled with Dr. Lewin's opinion that Plaintiff's attendance during a normal workweek would be affected by his psychological impairments. (Tr. 36).

Plaintiff testified he stopped working in May 2008 because he had back-to-back seizures. (Tr. 39). He said he was trying to obtain employment but no one was hiring or "they've already filled the position." (Tr. 40). Concerning daily activity, Plaintiff stated he sometimes cleaned his bedroom, bathroom, living room, stairs, but he mainly watched television and tried to cook at times. (Tr. 39).

Plaintiff testified that for the past year and a half, he had about one seizure a month. (Tr. 43). However, when the ALJ questioned him further based on Dr. Lynch's notes, Plaintiff acknowledged he had been seizure free for over two years. (Tr. 45). When questioned about his mental problems, Plaintiff said he suffered from depression. (Tr. 48). When further pressed about his mental issues, Plaintiff stated "off hand right now I cannot think of anything, my mind is starting to go blank." (Tr. 49). He stated he had just graduated from anger management group as a result of getting into an argument with police. (Tr. 49). The ALJ then asked Plaintiff if there were any other conditions he had not asked about and Plaintiff responded "not that I know of." (Tr. 49).

13

Plaintiff later said he heard voices and had hallucinations. (Tr. 51). He reported when he closed his eyes for a split second he saw "things that people wouldn't normally see" or would hear "voices or people calling [him] and they're not even really there". (Tr. 52). The ALJ asked Plaintiff's attorney if he had any questions for Plaintiff and he responded, "I think you addressed everything I was going to ask. No, your Honor, I don't think I need to ask any questions." (Tr. 54).

The VE testified Plaintiff's past work was categorized as kitchen helper, fast food worker, and cleaner according to the *Dictionary of Occupational Titles* (DOT). (Tr. 55). The ALJ asked the VE to assume a hypothetical person with the same age, education, and work experience as Plaintiff, who could work at a medium level of exertion, but never climb ladders, ropes or scaffolds, avoid concentrated exposure to environmental irritants, avoid moving machinery, and exposure to unprotected heights. (Tr. 56) Work would be limited to simple, routine, and repetitive tasks performed in an environment free of fast paced production requirements, involving only simple work related decisions and routine work place changes. (Tr. 56). The VE found this hypothetical individual could perform Plaintiff's past jobs with the exception of fast food worker. (Tr. 56).

The ALJ's second hypothetical mirrored the first, but the individual could only perform light work. The VE found this person could only perform Plaintiff's past work as a cleaner. (Tr. 56). The ALJ's third hypothetical mirrored the first but the individual could perform only sedentary work. (Tr. 56). The VE found this person could not perform Plaintiff's past work but could perform jobs that existed in the national economy such as, table worker, sorter, or package handler. (Tr. 57).

The ALJ added additional restrictions – superficial and no direct interaction with the public and only occasional interaction with co-workers – to the third "sedentary" hypothetical. The VE responded this person would be able to perform work as a table worker, sorter, or package handler.

14

Plaintiff's counsel asked the VE if the third hypothetical person would be able to perform work if he was markedly limited in his ability to complete a workweek (pursuant to Dr. Comley's restrictions). The VE responded that a person with that added restriction would not be able to work. (Tr. 59).

After the VE testimony, the ALJ requested Plaintiff's girlfriend Tara Hill testify. (Tr. 59-64). Ms. Hill had not been present for Plaintiff's testimony. She testified she had lived with Plaintiff for four years. (Tr. 60). Concerning Plaintiff's mental health, she stated Plaintiff had a seizure disorder and "I guess he's got depression [] that was diagnosed not too long ago." (Tr. 63). Ms. Hill never indicated Plaintiff suffered from auditory or visual hallucinations.

### *ALJ Decision*

In a decision dated April 27, 2011, the ALJ found Plaintiff could perform limited sedentary work existing in the national economy. (Tr. 7-23).

Although he found they did not meet a listed impairment, the ALJ found Plaintiff had the following severe impairments: seizure disorder, asthma, ADHD, psychotic disorder not otherwise specified, depressive disorder not otherwise specified, disc herniation at L4-5, left foot drop, history of club feet, hypertension, obesity, and tenosynovitis of the left ankle. (Tr. 12-13).

The ALJ found Plaintiff's seizure disorder was under control when he was compliant with his medications. (Tr. 16). He discussed Plaintiff's reports of hallucinations at the Counseling Center in August 2009 and noted Plaintiff was diagnosed with psychotic and depressive disorder. (Tr. 20). The ALJ also noted Plaintiff did not mention hallucinations to Dr. Sunbury during his consultive examination. (Tr. 20).

The ALJ discussed Dr. Comley's assessment and assigned his "psychologically disabled"

15

opinion little weight because it was an issue reserved to the Commissioner. Further, the ALJ found Dr. Comley's conclusions were based on a one-time examination and were not consistent with treatment notes or Plaintiff's activities of daily living. (Tr. 20-21).

The ALJ gave significant weight to Drs. Lewin and Meyer, noting they were consistent with Plaintiff's course of psychological treatment. (Tr. 21).

The ALJ found Plaintiff's RFC was as follows:

> I find that [Plaintiff] [can perform] . . . sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except he cannot climb ladders, ropes or scaffolds. He must avoid concentrated exposure to environmental irritants. [Plaintiff] must avoid all use of moving machinery and exposure to unprotected heights. He is limited to work that is simple, routine, and repetitive, performed in a work environment free of fast-paces production requirements, involving only simple work related decisions and routine work place changes. [Plaintiff] can have superficial, but no direct, interaction with the public, and only occasional interaction with co-workers.

(Tr. 15).

Based on VE testimony, the ALJ found Plaintiff could not perform past work, but could perform jobs that existed in the national economy. (Tr. 22-23).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

16

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the

17

national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff asserts the ALJ erred in devising Plaintiff's mental RFC because he failed to incorporate all the mental limitations imposed by Drs. Lewin and Meyer, relied on Dr. Meyer's affirming opinion, rejected Dr. Comley's opinion, and failed to obtain an updated medical expert opinion. (Doc. 14, at 17-22).

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence *Id.* § 416.929. While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004);  20 C.F.R.§§ 404.1527(e)(2), 404.1546, 416.927, and 416.945(a)(1).

<u>ALJ's Evaluation of Opinion Evidence</u>

"Under the regulations, ALJs 'must consider findings of [s]tate agency medical and psychological consultants,' but ALJs 'are not bound by any findings made by [s]tate agency medical or psychological consultants.'" *Renfro v. Barnhart*, 30 F. App'x 431, 436 (6th Cir. 2002) (quoting 20 C.F.R. § 404 .1527(f)(2)(i)). However, "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp. 2d 813, 823-24 (S.D. Ohio 2011). This occurs because

18

the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(d),(f); SSR 96–6p at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp. 2d at 823-24.

*Dr. Lewin*

First, Plaintiff argues the ALJ erred in giving the opinion of non–examining state agency psychologist Dr. Lewin "significant weight" but then failing to adopt her actual RFC opinion in its entirety without explaining the divergence. (Doc. 14, at 18-19; Doc. 20, at 1). The ALJ's opinion regarding Plaintiff's functional limitations for interacting with others differed from those set forth by Dr. Lewin – namely, the ALJ restricted Plaintiff to superficial interaction with only the public and occasional interaction with co-workers, while Dr. Lewin's opinion restricted him to superficial interaction with supervisors, co-workers, and the public. The ALJ also did not include any limitation with respect to Plaintiff's alleged inability to complete a normal workweek.

Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight. While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner. *Ford*, 114 F. App'x at 198.

The ALJ gave Dr. Lewin's opinion significant weight and adopted the majority of her functional limitations. He explained Dr. Lewin's opinion was consistent with Plaintiff's course of psychological treatment, and considered his social problems and difficulty concentrating. (Tr. 21). This explanation sufficiently described the weight he assigned Dr. Lewin's opinion according to the

19

factors outlined in 20 C.F.R. § 404.1527(f)(2), and the ALJ was not legally required to explain limitations Dr. Lewin imposed that were not incorporated into his RFC.

Indeed, medical evidence substantially supports the ALJ's RFC without those limitations. Plaintiff received employment assistance from BVR, consistently attended job fairs, met with or spoke to prospective employers, and attended job assessments. (Tr. 270-77, 283-308). He worked efficiently in a group setting or individually and was generally described as having a positive mood. (*See* Tr. 279). He also attended group therapy at the Counseling Center and participated well within the group.  (Tr. 911). While there is evidence Plaintiff had anger issues, he testified he recently graduated from an anger management group. (Tr. 49). Moreover, some of anger behavior was related to his epilepsy (Tr. 370), but Plaintiff's epilepsy was controlled with medication and he had not experienced a seizure in over two years.

Plaintiff contends his mental state – namely his auditory hallucinations and delusions, depression, and anger issues – prevent him from being able to work a full work week. However, as the ALJ pointed out, while Plaintiff did report hallucinations for a short period of time, the majority of his sessions at the Counseling Center focused on frustrations regarding his living situation, his girlfriend, and his denial of social security benefits. (Tr. 20). Ms. Brugger did note Plaintiff was "visibly talking to his 'voices'" on one occasion, but she later noted he "appear[ed] to be very focused on getting his disability and at times appear[ed] to emphasize the drama of his symptoms". (*See* Tr. 594, 786). While Dr. Zewail diagnosed Plaintiff with schizophrenia, she noted it was controlled with Seroquel. (Tr. 575-76). Further, the ALJ reasonably noted that when Ms. Hill testified, she did not spend much time discussing Plaintiff's mental problems. (*See* Tr. 21, 60-63). She had lived with Plaintiff for four years but stated he had only recently been diagnosed with depression and never mentioned hallucinations, delusions, or suicide attempts. The foregoing

20

constitutes substantial evidence no additional restrictions were required other than those already imposed by the ALJ.

*Dr. Meyer*

Plaintiff additionally argues the ALJ erred by relying on the opinion of state agency reviewer Dr. Meyer, who affirmed Dr. Lewin's April 2009 opinion in September 2009. (Doc. 14, at 18-19; Tr. 581). Plaintiff contends Dr. Meyer's assessment was inaccurate because he either lacked sufficient evidence of Plaintiff's hallucinations or did not take them into account.

Dr. Meyer did consider the "return of hallucinations" but concluded the evidence did not support new and material changes to Dr. Lewin's opinion and chose to affirm it. (Tr. 581). Plaintiff is correct to note Dr. Meyer did not review all the evidence relating to Plaintiff's hallucinations because all the evidence did not exist when he affirmed Dr. Lewin's opinion. Plaintiff reported hallucinations between August 2009 and June 2010, Dr. Meyer affirmed Dr. Lewin's opinion September 2009. However, the ALJ had all of the evidence pertaining to Plaintiff's hallucinations, which he reviewed and discussed in his decision. In the end, the ALJ utilized his discretion and chose to afford "significant weight" to both state agency reviewers opinions, which he was legally permitted to do. § 416.927(d); *Douglas*, 832 F.Supp. 2d at 823-24; SSR 96–6p at *2–3.

Relatedly, Plaintiff argues the ALJ improperly relied on VE testimony given in response to a flawed hypothetical, which failed to account for all the mental limitations set forth by Dr. Lewin. (Doc. 14, at 19). However, an ALJ is only required to incorporate those limitations into his RFC or hypothetical question to the VE that he finds credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).The ALJ was permitted to devise an RFC posed as a hypothetical based on his consideration of medical opinions in the record.  As noted above, his RFC is supported by substantial evidence.

21

*Dr. Comley*

Dr. Comley concluded Plaintiff was markedly limited in his abilities to work with others or complete a normal workweek without interruption, opining he should be considered "psychologically disabled". (Tr. 612).

Plaintiff argues the ALJ erred because he did not weigh Dr. Comley's opinion according to the factors in 20 C.F.R. 404.1527 – examining relationship, treatment relationship, supportability, consistency, and specialization. (Doc. 14, at 20-21). This is not so.

The ALJ explicitly rejected Dr. Comley's opinion that Plaintiff is "psychologically disabled" because it was an issue reserved to the Commissioner. §§ 404.1503, 404.1527(e), 416.903, and 416.927(e); (Tr. 21). He further afforded Dr. Comley's opinion little weight because "his conclusions [were] based on a onetime examination, and [were] not consistent with the treatment notes [or] [Plaintiff's] activities of daily living." (Tr. 21). This statement, while brief, touched several of the factors an ALJ is required to consider in § 404.1527 – treatment relationship, supportability, and consistency – which is all that is required. *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (While the stated reason for discounting a physician was brief, it was sufficient because it accounted for several factors in § 404.1527).

Medical Expert

Last, Plaintiff alleges the ALJ erred by failing to employ a medical expert, given the resurgence of Plaintiff's psychotic symptoms subsequent to the state reviewing consulting opinions coupled with his decision to afford little weight to Dr. Comley's opinion. (Doc. 20, at 8).

Under Social Security law, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination [] rests with the claimant." *Landsaw*, 803 F.3d at 214.  The ALJ has the "discretion to determine whether further evidence, such

22

as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. § 416.917 ("If your medical sources cannot or will not give us sufficient evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests." (emphasis added)).  Additionally, the regulations give an ALJ discretion to determine whether to consult a medical expert. 20 C.F.R. § 416.927(f)(2)(iii) (ALJ "*may* . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment" (emphasis added)). "The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the [ALJ], who is not a medical professional, may understand." *Fullen v. Comm'r of Soc. Sec.,* 2010 WL 2789581, *12 (S.D. Ohio) (citing *Richardson v. Perales*, 402 U.S. 389, 408 (1972)).

Plaintiff primarily argues that after discounting Dr. Comley's opinion, the ALJ was left in a position to make medical judgments about Plaintiff's mental health condition, because no medical expert reviewed Plaintiff's psychosis. This is simply not true.

First, although the ALJ gave Dr. Comley little weight, he did not completely reject his opinion. In addition, the record included over three years of mental health treatment notes from the Counseling Center, including notes regarding the "resurgence of hallucinations". These treatment notes mainly reflected Plaintiff's anxiety over his living situation, his girlfriend, and his denial of social security benefits.  Further, Dr. Zewail's diagnosed Plaintiff with schizophrenia but noted it was controlled with Seroquel. (Tr.575-76). And by June 2010, Plaintiff abruptly ceased reporting hallucinations. There was clear, sufficient evidence in the record for the ALJ to make a determination. And since the regulations give an ALJ discretion to determine whether to consult a medical expert, he did not err. 20 C.F.R. § 416.927(f)(2)(iii)

23

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

_____s/James R. Knepp, II_____
United States Magistrate Judge

24